IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Products/Techniques, Inc. and Steven Andrews

Plaintiffs,

V,                                                          C.A. NO. _____

SocoPaint LLC,

Defendant.

## COMPLAINT

Plaintiff Products/Techniques, Inc. and Steven Andrews (collectively, "Plaintiffs") bring this Complaint, seeking damages and declaratory relief against Defendant SocoPaint LLC ("SocoPaint" or "Defendant"), and allege as follows:

### PRELIMINARY STATEMENT

1.      After arm's length negotiations, Defendant entered into a contract that outlines the terms and conditions by which SocoPaint acquired certain top-selling coating and paint brands and product lines from the plaintiff Products/Techniques, a well-established manufacturer to the U.S. Department of Defense. Namely, SocoPaint agreed to actively manufacture, market, and sell the purchased products—and pay Plaintiffs both an initial lump-sum purchase price as well as a continuing share of future profits for the next decade via annual royalty payments. SocoPaint made representations and warranties under the parties' contract of its intention to utilize and promote the purchased products.

2.      SocoPaint's breaches of the parties' agreements and failures to manufacture, market, and sell the purchased products have depressed sales and decreased revenues, and thereby, the royalties owed to Plaintiffs. Defendant's actions go against the spirit and letter of the

agreements between the parties. The only logical conclusion to be drawn is that SocoPaint seeks to intentionally manipulate and depress sales figures, claim a lack of demand, or employ other tactics to discount Plaintiffs' share payments and, ultimately, force Plaintiffs to "put" their ownership in future revenue for an artificially discounted sales price. If left unchecked, SocoPaint will be unjustly enriched from the purchased assets without adequate compensation to Plaintiffs.

3.     Plaintiffs sue Defendant for its breaches of contract, misappropriation of trade secrets, and other unlawful actions complained of herein and seek redress through declaratory judgment relief as well as recovery of damages, attorney's fees, and costs.

## PARTIES

4.     Products/Techniques, Inc. ("Products/Techniques") is a California corporation with a principal place of business in Rialto, California. For over 75 years, Products/Techniques specialized in developing, testing, manufacturing, and selling specialty paints, coatings, primers, paint removers, solvent blends and other products and systems involved in the surface preparation and painting process, primarily for use in the space, aerospace & aviation, oil & gas, and original equipment manufacturing industries. Its products included approximately 130 military and federal specification coatings and numerous proprietary coating formulations. Products/Techniques has been family owned and operated since 1971 and proudly manufactured all its products in the United States.

5.     Plaintiff Steven Andrews ("Mr. Andrews") is Products/Techniques' majority shareholder and has served as its hands-on chief executive officer and president for the past 25 years. Mr. Andrews directly participated in all aspects of Product Techniques' operations, from developing new product formulations to product manufacturing to product certification to qualification testing to sales and delivery. Mr. Andrews was previously a resident of California and is now a Florida resident.

-2-

6.     Defendant SocoPaint LLC ("SocoPaint") is a Texas limited liability company with a principal place of business located at 5475 East Highway 114, Rhome, Wise County, Texas 76078. SocoPaint may be served through its registered agent, Broude Smith Jennings & McGlinchey PC at 306 West 7th St., Ste. 306, Fort Worth, Texas 76102.

7.     According to public filings with the Texas Secretary of State, SocoPaint is 100 percent owned by Socomore Holdings, LLC, a Texas limited liability company whose principal place of business is also located at 5475 East Highway 114, Rhome, Texas 76078. The public information report for Socomore Holdings, LLC appears to incorrectly identify Dysol, Inc., a Texas corporation, SocoBuild, LLC, a Texas limited liability company, SocoKote, LLC, a Delaware limited liability company, SocoFlame, Inc., a Delaware corporation, SocoBlend, LLC, a Texas limited liability company, and SocoPaint as each 100 percent owners of Socomore Holdings, LLC. On information and belief, however, those entities are actually wholly owned subsidiaries of Socomore Holdings, LLC, and Socomore Holdings, LLC is ultimately majority or wholly owned by Groupe Socomore SA ("Socomore"), a French societe anonyme, and thereby, the ultimate parent of SocoPaint. The majority shareholder and chief executive officer of Socomore is Frédéric Lescure. According to SocoPaint's certificate of formation, Mr. Lescure was also one of the four original managers of SocoPaint, together with Andrew Leech, Andre Guerin, and Julien Le Lay, and one of two original managers of Socomore Holdings, LLC. According to the most recent public information reports, however, Andrew Leech and Julien Le Lay are the two directors of both SocoPaint and Socomore Holdings, LLC. Mr. Leech is Vice President—North American, and Mr. Le Lay is the Financial Officer, of Socomore.

8.     Socomore is also in the business of developing, manufacturing, and selling products for surface treatment, including coatings, paint strippers, degreasers and cleaners, deoxidizers,

solvents, and other products, which are often used as part of the painting process. Like Products/Techniques, Socomore's products are used primarily in the aerospace and other transport industries, energy sector, and original equipment manufacturing.

9.      Socomore's business is global. Per its website, "supporting [its] international customers by adapting to local conditions is a priority" of Socomore's, and it "meet[s] the high expectations of [its] global customers and provide[s] them with complementary products and synergies worldwide" through subsidiaries, commercial partnerships, and corporate acquisitions. To that end, in addition to the U.S., Socomore maintains production facilities in Canada, France, and Ireland; corporate offices in France, the United Kingdom, Spain, Italy, Germany, Poland, Japan, and Brazil; partnerships with other market participants in France, the United Kingdom, Germany, Russia, and China; and two R&D laboratories in France.

10.     SocoPaint is the entity created by Socomore to acquire a majority of Products/Techniques' assets and product lines (*i.e.*, the Purchased Products).

## JURISDICTION AND VENUE

11.     The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds the jurisdictional minimum.

12.     Plaintiff Products/Techniques is a California corporation with its principal place of business in California. Plaintiff Steven Andrews was formerly a permanent resident of California and within the past few weeks has become a permanent resident of Florida. Plaintiffs are therefore California and Florida residents for purposes of diversity jurisdiction.

13.     Defendant SocoPaint and its sole owner Socomore Holdings, LLC, are Texas limited liability companies with principal places of business in Rhome, Texas. On information and belief, Socomore Holdings, LLC's sole owner is Socomore, a French corporation. SocoPaint, its

sole member, and its member's sole member are citizens of Texas and France for diversity jurisdiction purposes.

14.     The amount in controversy exceeds $75,000. SocoPaint's failures to market, manufacture, and sell the products at issue in a manner consistent with its obligations to Plaintiffs have depressed sales and decreased revenues, and thereby, the royalty payments owed to Plaintiffs, in an amount greater than $75,000.

15.     Separately, the Court has federal question jurisdiction pursuant to 18 U.S.C. § 1836(c) and 18 U.S.C. § 1030(g). Plaintiffs assert a claim under § 1836(c) for misappropriation of trade secrets, including product formulations for paint strippers and other products used in the coating and painting process, which products are sold in interstate commerce to customers across the country and throughout the world. Plaintiffs also assert a claim under § 1030(g) related to Defendant's unauthorized access of Plaintiffs' computer systems.

16.     SocoPaint has consented to jurisdiction and venue in this District Court pursuant to the parties' agreements, including but not limited to, Section 13.12 of the July 23, 2021 Asset Purchase Agreement and the parties' stipulation dated October 3, 2023. *See Atlantic Marine Construction Company, Incorporated v. United States District Court for the Western District Of Texas*, 134 S. Ct. 568 (U.S. 2013).

17.     Alternatively, and on information and belief, the Court has personal jurisdiction over SocoPaint because it has regularly and systematically transacted business in Delaware and all or a substantial part of the events or omissions giving rise to the claims occurred in Delaware. Therefore, venue is also proper in this District because a substantial part of the events giving rise to Product/Techniques' and Mr. Andrews' claims occurred here as well. *See* 28 U.S.C. § 1391(b).

**FACTUAL ALLEGATIONS**

**A.    Products/Techniques' Product Lines and History of Success**

18.    For more than 50 years, Products/Techniques was family owned and operated, with Steven Andrews at the helm for the past 25 years. Products/Techniques focused on the development, manufacture, and sale of specialty paints and coatings for use in the space, aerospace & aviation, oil & gas, and original equipment manufacturing industries. Products/Techniques also developed and manufactured paint removing products and solvent blends and offered solvent repackaging, toll manufacturing, and aerosoling systems to its customers. Products/Techniques' products were marketed under various brand names and product lines, including Products Techniques, Product/Techniques, PTI, PTI Paint, Certified Coatings, and Lyft-Off, among others.

19.    Under Mr. Andrews' stewardship, Products/Techniques grew into a successful, respected business with a reputation for product quality and consistency which, in turn, attracted long-term, repeat customers. In the 12-month period from July 1, 2020 through June 20, 2021, Products/Techniques had sales revenue of over $1.6 million just for the products purchased under the APA by Socomore (*i.e.*, this does not include paint removers and products excluded from the asset sale).

20.    Over time, Products/Techniques proprietary coatings and product offerings grew to include over 130 specialty products that met various military specification (*i.e.*, "MIL-SPECS") and federal regulations or other requirements (*e.g.*, Federal Acquisition Regulations (the "FAR")), including acrylic, Butyrate Dope, cleaners, enamel, epoxy, lacquer, marking ink, paint removers, paste, phenolic, polyurethane, primer, sealant, silicone base, solvents, solvent blends, "techlubes," varnish, and waterborne coatings.

21.    Certain of Products/Techniques' products, including some of Products/Techniques' best-sellers, were prequalified, certified, and included in the U.S. Department of Defense's

Qualified Products Database (hereinafter, the "Qualified Products"). The Qualified Products Database ("QPD") "contains qualification information regarding products and manufacturers," and a product's inclusion in the QPD "provide[s] buyers with assurance that items currently comply with specified requirements."[1] The products' prequalification "improves readiness by ensuring the availability pf products with requisite quality, reliability, performance and safety from trusted manufacturers or distributors" and "help[s] reduce costs by eliminating repetitive surveillance audits and tests."[2]

22.     QPD products can be relied upon by defense contractors in their manufacture of goods that themselves must also meet certain MIL=SPECS and/or other requirements. Such contractors can bid on contracts and plan their manufacturing activities knowing that the QPD products will be readily available and consistently perform to spec. As one of few, if not the lone, supplier of its Qualified Products and other specialty defense products, Products/Techniques served as a critical supplier to many companies serving the U.S. defense industry.

23.     Similarly, Products/Techniques' international customers were able to and did rely upon the consistent composition and quality of Product/Techniques' Qualified Products and other specialty products in their own manufacturing, knowing that such products would meet not only applicable military specifications but also the often stricter environmental regulations common throughout Europe and elsewhere.

---

[1] *See* https://qpldocs.dla.mil/help/about.aspx.
[2] S*ee* https://www.dsp.dla.mil/Programs/Qualification/#:~:text=Products%20or%20manufacturers%20qualified%20 to%20the%20requirements%20in,List%20%28QML%29%20in%20the%20Qualified%20Product%20Database %20%28QPD%29.

**B.** **Socomore Acquires Certain of Products/Techniques' Products in July 2021 in exchange for a lump sum payment and continuing royalties.**

24.     Socomore is an international provider of solutions for surface preparation, processing and protection. Founded in 1972 to serve local needs, Socomore eventually expanded throughout Europe and Asia and then, eventually, North America around the turn of the century. In 2001 Socomore partnered with Contec, a U.S. company, to produce solvent pre-saturated wipes, and continued to expand its presence in North America through acquisitions of U.S. companies.

25.     In 2020, Socomore approached Mr. Andrews and began negotiating the terms for Socomore's acquisition of certain of Products/Techniques' assets. Mr. Andrews was nearing retirement and was therefore interested in a potential sale. As such, a sale involving ongoing royalty payments from a proven product stream was determined to be a material component of any sale, as it would provide a consistent, future income stream with the potential to benefit from any increase in sales that should naturally follow from a sale to a larger market participant, like Socomore.

26.     By December 2020, Socomore issued a Letter of Intent to Products/Techniques setting forth the general deal structure and terms, including the proposed purchase price structure for an initial lump sum payment and continuing royalties on sales for up to ten years or an option to "put" the royalties for a second lump sum payment.

27.     Products/Techniques, Mr. Andrews, and defendant SocoPaint (the entity created by Socomore to effect the transaction) executed the Asset Purchase Agreement dated as of July 23, 2021, by and among SocoPaint LLC, as Purchaser, and Products/Techniques, Inc., as Seller, and Steven Andrews (the "APA").  Pursuant to the APA, SocoPaint acquired certain, enumerated product brands and lines from Products/Techniques, including many Qualified Products, together with enumerated related assets (collectively, the "Purchased Products").

28.     The Purchased Products included: all products and development efforts set forth in Schedule 2.1(a)(ii), the Lyft-Off product, work in process toward new formulations, enhancements, modifications of, and new products derived from the listed products; intellectual property and trade secrets, business records, goodwill, and rights and remedies against third that related to the Purchased Products (all as more specifically defined in the APA); all of Products/Techniques' rights under specific Customer Agreements; and the domain name ptipaint.com.

29.     Importantly, any and all of PTI's assets not specifically included as part of the Purchased Products, including paint removers (other than Lyft-Off) and solvent blends products, were not included among the assets sold to Socomore. In addition, predecessor versions of the Purchased Products that were no longer marketed or sold prior to the execution of the APA, as well as their related IP (e.g., product formulas), were excluded from the sale. Products/Techniques retained all rights to these products, including related intellectual property, trade secrets, service lines, customer lists, and other related assets (collectively, the "Excluded Products"). *See generally* APA § 2.1.

30.     Consistent with the parties' letter of intent, Socomore acquired the Purchased Products in exchange for an initial lump sum payment plus ten years' of royalties, or "EBITDA Share Payments," on sales of the Purchased Products. APA § 2.3. The EBIDTA Share Payment calculation method is set out in the APA, and as indicated by its name, is based on SocoPaint's EBIDTA, which is driven, in large part, by SocoPaint's sales of the Purchased Products. *See* APA § 2.3 & Ex. A. Each year's EBIDTA Share Payment was due to Products/Techniques by no later than February 15 of the following year. APA § 2.3(b)(ii).

31.     As an alternative to the EBITDA Share Payments, for the first five years following the execution of the APA, Products/Techniques holds an option to "put" the payments in exchange for receiving a second lump sum payment, to be calculated as set forth in the APA. *See* APA §§ 2.3 & 3.1. If Products/Techniques does not put its EBIDTA Share Payments in the first five years after the APA, Socomore holds an option to "call" them in exchange for a lump sum payment to be calculated as set forth in the APA. APA § 3.2. In either case, the second lump sum payment amount is a function of SocoPaint's EBIDTA.

**C.      Products/Techniques manufactured the Purchased Products for SocoPaint In the Initial Period Following the APA Pursuant to a Contemporaneously Executed Toll Manufacturing Agreement.**

32.     As part of the sale to SocoPaint, the parties contemplated that Products/Techniques would continue to manufacture the Purchased Products on SocoPaint's behalf for an unspecified length of time following the sale. *See, e.g.*, APA at 8-9 (defining "Related Agreements" to include "the Toll Manufacturing Agreement, and any other agreement between [SocoPaint] and [Products/Techniques] that is contemplated by this Agreement"); APA § 4.2(e) (listing an executed Toll Manufacturing Agreement as one of [Products/Techniques'] deliverables for closing); TMA at 1, "Recitals"(C).

33.     The parties entered into the Toll Manufacturing Agreement by and between SocoPaint LLC and Products/Techniques, Inc., dated effective as of August 12, 2021 (the "TMA"). Pursuant thereto, Products/Techniques would receive additional compensation for manufacturing the products (in addition to the EBIDTA Share Payment it was entitled to under the APA). TMA § 8.1. The TMA was set to expire on June 30, 2024, unless terminated beforehand by SocoPaint for convenience or as otherwise permitted. TMS §§ 7.1-7.3. Though SocoPaint never provided the formal termination notice required by the TMA, SocoPaint communicated its intent to stop sending orders to Products/Techniques under the TMA in or about November 2022.

34.     The TMA was intended to provide SocoPaint with sufficient time to learn the manufacturing processes for the Purchased Products, arrange for their manufacture at one or more alternative facilities, requalify the Purchased Products and the new manufacturing locations as needed to maintain their existing qualifications and certifications, as applicable, including inclusion in the QPD, and coordinate the transfer of customer service to SocoPaint. *See* TMA § 3.4 ("At least quarterly . . . PTI shall allow Socomore to . . . access to the production area . . . [and] to observe the full production process utilized by PTI . . . . [PTI] shall cooperate . . . with regards to providing any information reasonably sought by Socomore relating to the processes utilized by PTI in preparing, mixing, manufacturing, making, storing, packaging, labeling, and transporting the . . . Products."); *see also* TMA § 3.3 (describing the up to "1600 hours" of assistance and other materials Products/Techniques was to provide, if and as requested, to facilitate the transfer of product manufacturing to, and qualification of, new manufacturing facilities); APA § 7.6(a)-(b)

**D.     The APA and TMA Impose Obligations on SocoPaint Designed to Protect the Value of Products/Techniques' Future Royalty Payments and Ensure SocoPaint Honored the Terms of the Deal.**

35.     Since a significant portion of the sale price is dependent on SocoPaint's post-APA sales of the Purchased Products, and Mr. Andrews intended to rely on the continuing royalty payments at the beginning of his much deserved and earned retirement, Plaintiffs negotiated the inclusion of express protections in the APA and TMA that were designed to maintain, if not increase, sales of the Purchased Products and prevent SocoPaint from artificially deflating future sales and thereby, the total sales price.

36.     ***Good Faith and Commercial Reasonableness***: *First*, the APA requires Socomore to "operate the Business in good faith and in a commercially reasonable manner" for as long as it owes EBIDTA Share Payments. APA § 3.3(a).[3]

37.     ***Intentional Sabotage, By Inaction or Inaction, Prohibited***: *Second*, for so long as EBIDTA Share Payments are owed to Products/Techniques, Socomore, and its officers, managers and employees "shall not . . . (A) take, or fail to take, any actions with the primary intention of (1) reducing the amount of the EBITDA Share Payment, or (2) otherwise circumventing the payments to [Products/Techniques] contemplated by this Agreement . . . ." APA § 3.3(b).

38.     ***Must Use "All Commercially Reasonable Efforts" to Requalify Qualified Products By Year-End 2022***: *Third*, the APA provided further assurances to Products/Techniques that SocoPaint would take the requisite steps to conduct product performance testing and obtain facility qualifications to ensure no interruption in the manufacture and sale of Qualified Products once Products/Techniques ceased its toll-manufacturing operations. Numerous Qualified Products were among the best-selling Purchased Products. And it is vital that SocoPaint perform all necessary testing to obtain and maintain the certifications and qualifications needed for those products to remain on the QPD. Any failure to do so would render the products unsuitable to large swaths of customers of those products and consequently result in a steep decline in sales.

39.     Indeed, the parties expressly recognized the criticality and urgency of SocoPaint's re-qualification efforts in the TMA: And for this reason, though the APA already required

---

[3] The APA defined the "Business" as the business Products/Techniques' operated "involving the researching and developing, designing, preparing, mixing, manufacturing, packaging, distributing, marketing, and selling of protection and specialty coatings, coating additives, cleaners, dry film lubricating systems and similar advanced materials throughout the United States, Canada, Japan, India and Europe for use in the space, aerospace, aviation, oil and gas, manufacturing, maintenance, repair, overhaul and field operations industries, including (a) those products that are sold under the Products Techniques, Products / Techniques, PTI, PTI Paint and Certified Coatings brand names, and (b) the Lyft-off Product, each as listed on Schedule 2.1(a)(ii) . . . ." APA Art. I at "Business"; APA at 1 (recitals).

SocoPaint to market, manufacture, and sell the Purchase Products in a commercially reasonable manner, the TMA imposed on SocoPaint a more specific obligation to "use all commercially reasonable efforts" to expediently requalify Qualified Products, and to do so by no later than December 31, 2022: "The parties agree that expediency is of utmost importance, and shall use all commercially reasonable efforts to ensure that in all instances the date that each customer qualifies the new location(s) shall be no later than December 31, 2022." TMA § 3.3(a).

40.     The parties also recognized that the qualification and requalification of alternative manufacturing facilities and products would require a significant amount of assistance from Mr. Andrews or others from Products/Techniques. *Id.* (describing the creation of a Qualified Products Transfer Plan); *see also id.* § 3.3(b) (contemplating up to 1,600 hours of Products/Techniques' assistance to qualify up to two alternative manufacturing locations per Qualified Product); *id.* § 3.3(f) (providing that when SocoPaint assumes manufacturing responsibilities for products, "PTI will send Representatives . . . to observe, consult, advise, and assist Socomore (or its designee) in setup, license approval (if any) and production . . . "); *id.* § 3.4 (granting SocoPaint at least quarterly access to Products/Techniques' toll manufacturing facilities and employees to learn the production process); APA § 7.6 (much of the same).

41.     ***Derivatives of the Purchased Products are Subject to Plaintiffs' Royalties:*** *Fourth*, the APA's "Description of Assets" in § 2.1(a)(ii) expressly refers to and includes "any Derivatives" of the Purchased Products. Product "Derivatives" include "any enhancements, modifications or new products derived from any" of the Purchased Products. APA at Art. I (defining "Derivatives"). Thus, if SocoPaint—or any other Socomore company—modifies any of the Purchased Products to meet domestic or international customers' needs and applicable

environmental and local requirements—sales of those products must also be included in the calculation of Plaintiffs' royalties.

42. ***Establishment of Joint Steering Committee to Monitor and Address Sales, Manufacturing, Marketing, and R&D***: *Fifth*, the APA further protected Products/Techniques from receiving depressed EBITDA Share Payments by requiring SocoPaint to form a Steering Committee composed of at least one director-level employee and a second representative from each company. APA § 8.1(a), (b). The Steering Committee was to "inform and advise" regarding:

- "recent results of the [Purchased] Products," *e.g.*, sales results and product qualifications/certifications, APA § 8.1(a)(i);

- potential business development opportunities, *id.*;

- potential product development opportunities, *id.*, and "research and development results and plans, including product development roadmaps," APA § 8.1(a)(ii);

- manufacturing and quality issues, APA § 8.1(a)(iii);

- transferring production of the Purchased Products to new facilities, APA § 8.1(a)(v), a process which inherently involves re-qualifying the Qualified Products and the new locations at which they would be manufactured;

- "existing and alternative marketing and sales efforts," APA § 8.1(a)(vii);

- the "development, implementation and review of a sales and marketing plan for Purchaser to follow regarding the [Purchased] Products," APA § 8.1(a)(viii); and

- other topics as proposed by the parties, APA § 8.1(a)(ix).

43. The Steering Committee was to initially meet quarterly, while Products/Techniques continued to manufacture the Purchased Products for SocoPaint pursuant to a toll-manufacturing agreement, and annually thereafter. APA § 8.1(c). Through the Steering Committee Products/Techniques could monitor SocoPaint's sales and marketing efforts and advise on necessary course corrections to ensure SocoPaint was taking steps to maintain, if not increase,

sales of—and revenue from—the Purchased Products. Products/Techniques was similarly able to monitor the transfer of manufacturing to new facilities, including SocoPaint, its affiliates, or third-party facilities to ensure product quality continued to meet customer expectations and that Qualified Products would continue to meet applicable MIL-SPECS and other performance requirements and/or be included in the QPD.

44.     ***Maintain Separate Books and Records for Sales of Purchased Products***: *Sixth*, to ensure the EBIDTA Share Payment was calculated accurately, and accounted for all sales of the Purchased Products, including sales through Socomore's affiliate entities, the APA required SocoPaint to "maintain separate books and records of the Business" for as long as it owed EBIDTA Share Payments to Products/Techniques. APA § 3.3(a)(B).

45.     ***Must Provide Records to Products/Techniques***: *Seventh*, SocoPaint was required to provide its separate books and records related to its operations involving the Purchased Products to Products/Techniques upon request. Specifically, the APA provides that upon request, SocoPaint "shall provide copies . . . for any reasonable business purpose, of any books, records and documents retained by [SocoPaint] related to the Business." APA § 8.6(b). This requirement enables Products/Techniques to verify the sales revenue used to calculate the EBIDTA Share Payment it is owed for each year. It also enables Products/Techniques to verify that SocoPaint is executing on any marketing plan and has expediently and properly sought to requalify the Qualified Products and new manufacturing facilities such that SocoPaint could support sales of the Purchased Products on an ongoing and uninterrupted basis.

**E.     SocoPaint Has Failed to Honor the Terms of the Parties' Deal and Its Failures Have Resulted in a Significant Decrease in Sales of the Purchased Products.**

46.     Despite SocoPaint's litany of obligations of Plaintiffs under the APA and TMA to take steps to ensure consistent, if not increased, sales of the Purchased Products, SocoPaint has

repeatedly failed to honor the terms of the parties' deal. SocoPaint's failures to act in a reasonable manner consistent with its obligations, in all ways, has significantly damaged Plaintiffs. Annual sales of the Purchased Products have significantly decreased by 200 to 300 percent, and thereby, the EBIDTA Share Payments owed to Plaintiffs have been substantially depressed.

47.     ***SocoPaint failed to provide requested sales records.*** SocoPaint has not provided adequate sales records to enable Plaintiffs to determine the sufficiency of SocoPaint's past or future royalty payments. SocoPaint has repeatedly ignored and otherwise failed to respond to Mr. Andrews' in-person, telephonic, and written questions regarding, and requests for supplemental information for, the records that SocoPaint has provided to date. Plaintiffs can only guess as to whether it received or will receive the full EBIDTA Share Payment it is entitled to under the APA without these records.

48.     ***SocoPaint failed to requalify the Qualified Products.*** Future sales of the Purchased Products are, in large part, dependent on SocoPaint's ability to requalify new manufacturing locations for Qualified Products—especially since SocoPaint terminated the TMA almost a year ago and Products/Techniques has ceased manufacturing operations. The qualification process involves submitting applications to the U.S. Naval Air Systems Command ("NAVAIR") to test product samples made at the new facilities, test samples of products made at those facilities, and any supporting self-testing reports and related records. The applications (and products) must then be accepted, after which it enters NAVAIR's "queue" of products awaiting QPD testing. Once accepted, the product must undergo a series of laboratory tests designed to simulate applicable environmental and other conditions to confirm whether the product meets applicable performance criteria. In the case of the Qualified Products, some of those criteria include the need to meet performance specifications after exposure to certain environmental elements for thousands of

hours. As a result, the QPD testing for the Qualified Products takes a substantial amount of time. From start to finish, the entire QPD certification process for just one of the Qualified Products takes months, at minimum, to complete.

49.     The parties' agreement contemplates that SocoPaint's preparation and submission of QPD testing applications for the Qualified Products would involve significant assistance provided by Plaintiffs—including training personnel at the new manufacturing locations on the manufacturing process to ensure that the products would continue to consistently perform to specifications. SocoPaint never requested Plaintiffs' assistance as contemplated in the APA and TMA.

50.     Now, months after the December 31, 2022 deadline to requalify new manufacturing locations for all of the Qualified Products, SocoPaint has not completed, much less passed, QPD testing for a single one. SocoPaint did not have a single QPD application accepted prior to the December 31, 2022 deadline, and still today, SocoPaint has not even submitted QPD applications for all of the Qualified Products.

51.     Rather, in January 2023, NAVAIR accepted only one of the Qualified Products for QPD testing. It accepted another version of the product (*i.e.*, the same coating in a different color) for QPD testing in June 2023. As of August 31, 2023, no other Qualified Products have been accepted for QPD testing.

52.     ***SocoPaint repeatedly delivered non-conforming products.*** In addition to failing to complete the QPD certification process for Qualified Products, SocoPaint has also repeatedly delivered products to Products/Techniques' former customers that did not perform as expected— and as it would have had SocoPaint properly manufactured and packaged it. SocoPaint's delivery of product that does not meet specifications is but further evidence that SocoPaint has failed to

satisfy its obligation to take "all commercially reasonable efforts" to qualify products and facilities. The shipment of non-performing and incomplete products are indicative of SocoPaint's lack of understanding of the products themselves and the absence of basic manufacturing procedures, such as post-production sample testing, that would preclude SocoPaint from effectively requalifying products and facilities without Plaintiffs' assistance. Such deliveries can also be fatal to a customer relationship, as defense contractors cannot tolerate suppliers that fail to consistently provide products at spec.

53. ***SocoPaint failed to market the Purchased Products.*** Perhaps unsurprising in light of SocoPaint's failure to qualify new facilities, SocoPaint has utterly failed, in every regard, to adequately or capably market the Purchased Products. Despite Plaintiffs' repeated requests, SocoPaint has never provided any semblance of a legitimate marketing plan or budget, product development plan, or anything that remotely charts a map for the continued success of the Purchased Products.

54. SocoPaint's marketing failures extend even into the pre-existing customer base for the Purchased Products. SocoPaint never partnered with Plaintiffs to facilitate the transfer of Products/Techniques' customer relationships to SocoPaint, as contemplated by the APA. *See* § 7.6. Indeed, Products/Techniques customers continue to contact Mr. Andrews to this day regarding product inquiries and potential orders.

55. Worse, on multiple occasions, SocoPaint's purported "customer service" and sales teams repeatedly ignored customer inquiries and purchase orders in the tens-of-thousands of dollars. In other cases, SocoPaint failed to deliver all necessary components for a multi-component coating system or delivered the wrong product, and then failed to provide sensible remedial measures. Such service would not be tolerated by the typical consumer, much less consumers in

the defense contracting field on strict, tight deadlines and who depend on the reliability of their raw products and providers. Suppliers are not provided three strikes before they are out in this industry.

56.     ***SocoPaint failed to act in a commercially reasonable way or in good faith.*** Collectively, SocoPaint's failure to take even the most basic steps to develop a marketing plan, develop manufacturing capabilities for the Purchased Products independent of Products/Techniques, requalify products, to develop and enhance existing products, or even provide even a minimum level of customer service amounts to a business being conducted in the exact opposite of a commercially reasonable manner. And it strongly suggests that SocoPaint entered into the APA and TMA in bad faith, and continues to act in bad faith. Indeed, the President of SocoPaint—and Socomore's entire North American Division—Andrew Leech, has made expressly clear to Mr. Andrews that he wants nothing to do with the Purchased Products since the closing.

57.     SocoPaint's ongoing failures, considered together, add up to a scheme to intentionally decrease sales of the Purchased Products to artificially decrease the ultimate purchase price SocoPaint must pay to Products/Techniques under the APA. That is the only reasonable explanation that SocoPaint, a for-profit entity, has for almost immediately showing no apparent interest in realizing the potential economic benefits of the Purchased Products it had just acquired. SocoPaint either acquired the Purchased Products to eliminate them from the market altogether rather than have one of its competitors acquire them. Or, SocoPaint is attempting to force Plaintiffs into exercising its right to "put" ongoing EBIDTA Share Payments in exchange for a second lump sum purchase price payment—which will have been artificially depressed by SocoPaint's course

of conduct since executing the APA. In either case, SocoPaint's actions violate the spirit and letter of the parties' agreements.

**F.     SocoPaint's Illicit Actions Against Plaintiffs Extend Beyond its Breaches of the APA and TMA.**

58.     ***SocoPaint's Unauthorized Access of Plaintiffs' computer systems.*** Under the guise of implementing the Toll Manufacturing Agreement, SocoPaint requested and received permission to connect the parties' enterprise resource planning ("ERP") software systems. The expressed purpose for doing so was to enable the automated transfer from SocoPaint to Products/Techniques of purchase orders received by SocoPaint for the Purchased Products, which Products/Techniques were still manufacturing under the TMA. Plaintiffs granted SocoPaint access to its ERP system for limited purpose of building, but not using, the back-end connection between the parties' software.

59.     SocoPaint not only corrupted Plaintiffs' ERP system in its failed attempts at connecting it to its own ERP system; SocoPaint also far exceeded its limited rights of access by exploiting the opportunity to install its own telecommunication router equipment in Plaintiffs' manufacturing facility and to  access data on Plaintiffs' server that it had no right to access.

60.     Unbeknownst to Plaintiffs, SocoPaint had disconnected Products/Techniques' server from Products/Techniques' router equipment and instead connected it SocoPaint's own router equipment, and thereby, SocoPaint's own internet connection. This provided SocoPaint with hidden access to Plaintiffs' entire server—access far in excess of the limited scope and duration of access which it was granted. SocoPaint's covert installation of its own routers caused conflicts in IP addresses. The conflict in IP addresses, in turn, resulted in inconsistent performance of Plaintiffs' telephones and software. Ultimately, it caused Plaintiffs' server to crash and completely

disabled Plaintiffs' VOIP telephone system. Plaintiffs had no internet, phone, or server access for four days.

61.     Worse, SocoPaint failed to properly design the data interchange connection between the parties' ERP software such that the data from SocoPaint's ERP system would not be accurately reflected once transferred into Product/Techniques' ERP software. Then, without adequately testing the new interconnect—and without authorization to do so—SocoPaint began pushing data into Products/Techniques' ERP system. This irreparably corrupted the data in the inventory module of Products/Techniques' ERP and required days of work to make to remediate other portions of the ERP system critical to Products/Techniques' performance under the TMA and other business unrelated to the Purchased Products.

62.     ***SocoPaint also stole product formulations it did not purchase.*** SocoPaint's misappropriation, misuse, and/or theft of Plaintiffs' trade secrets was only revealed when SocoPaint emailed a copy of a misappropriated product formulation to Plaintiffs to inquire where it could purchase an ingredient that was not used in any of the Purchased Products, or if no longer available in the supply chain, whether there were other products that could be substituted in its place. Mr. Andrews immediately replied that SocoPaint had no right to possess that product formula and inquired as to how SocoPaint came to possess it, SocoPaint failed to respond. And at no point thereafter has SocoPaint provided a legitimate explanation for how it came to possess the formula.

63.     Given what is already known about SocoPaint's unauthorized exploitation of Plaintiffs' computer systems and product data repositories, Plaintiffs suspect misappropriation, misuse, and/or theft of Products/Techniques' IP, trade secrets, and proprietary and confidential information—including, potentially, formulas for the products excluded from the APA and with

which SocoPaint markets competing products, customer lists for those products, and pricing information.

**G.      SocoPaint Has Failed To Adequately Respond to Plaintiffs' Repeated Inquiries and Demands to Cure.**

64.      Plaintiffs have repeatedly sought information, raised concerns, and demanded SocoPaint cure or remediate its repeated breaches of contract and tortious acts.

65.      Mr. Andrews has repeatedly requested information regarding SocoPaint's progress on requalifying products for the QPD, marketing efforts, and sales records in-person, telephonically, and via email. By no later than January 2022, Mr. Andrews had expressed concerns via email that SocoPaint had failed to make sufficient progress on requalifying products for the QPD. More recently, Mr. Andrews even emailed SocoPaint's outside counsel on May 5, 2023, concerning many of SocoPaint's breaches of the APA. Adequate information has still not been provided in response, and there is no other evidence suggesting SocoPaint has taken adequate actions to cure and remediate its breaches of contract.

66.      Mr. Andrews has also repeatedly forwarded customer complaints that he has received to SocoPaint, requesting time and again that SocoPaint provide basic customer service to these customers and address their complaints and order inquiries. As Mr. Andrews continues to receive such emails from customers, it is apparent SocoPaint still regularly fails to do so.

67.      Mr. Andrews also raised the alarm concerning SocoPaint's apparent theft of Plaintiffs' intellectual property and trade secrets that were not conveyed to SocoPaint under the APA—including in an April 2022 email thread, on which Messrs. Lescure, Leech, and Le Lay (as well as others) were copied, and in which SocoPaint was seeking supplier information for a product formula it did not purchase and should not have possessed. Mr. Andrews specifically communicated that SocoPaint had not purchased that product under the APA and had no right to

possess it. Mr. Andrews' also questioned how SocoPaint came to possess it. In the same email, Mr. Andrews also raised concerns and questions about SocoPaint's unauthorized access of Plaintiffs' servers. On still other occasions, Mr. Andrews complained to SocoPaint of the damage caused by SocoPaint's unauthorized access. Neither SocoPaint nor its attorneys has ever provided an adequate response.

68.    On August 9, 2023, Plaintiffs, through undersigned counsel, sent a Notice of Defaults, Demand to Cure, and Notice for Document and Information Preservation Letter to Mr. Leech, as a representative of SocoPaint, with copy to SocoPaint's outside counsel, Moore & Van Allen PLLC, and Socomore, *i.e.*, the parties set forth in the notice provisions of the APA. That letter raised the same concerns described herein. Subsequently, Mr. Andrews and undersigned counsel have conferred numerous times with SocoPaint and its counsel in attempt to resolve these disputes. Yet, even these attempts have failed to elicit an adequate and sufficient response from SocoPaint. SocoPaint has failed to provide the most basic of requested records and otherwise failed to demonstrate it has cured the alleged breaches and tortious conduct.

69.    Plaintiffs have been left with no choice but to file this lawsuit.

## COUNT I – BREACH OF CONTRACT

70.    Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

71.    The APA and TMA, and any amendments or supplemental agreements thereto, constitute valid and enforceable contracts.

72.    Plaintiffs have satisfied all material obligations under the APA and TMA, and any amendments thereto, and are not in breach of any provision thereof. All conditions precedent have been fulfilled.

73.     SocoPaint has breached the terms of the APA and TMA. SocoPaint failed to use all commercially reasonable efforts to qualify manufacturing facilities, requalify Qualified products, market, manufacture, and sell products, use other commercially reasonable and good faith efforts to promote and sell the Purchased Products for profit, provide records on request evidencing these activities. SocoPaint failed to maintain separate books and records and provide copies after receiving Plaintiffs' request.  Upon information and belief, SocoPaint failed to pay the proper amount of EBIDTA Share Payments owed to Plaintiffs based upon sales in both the United States and Europe of the Purchased Products and any Derivatives.

74.     SocoPaint's breaches are material and have caused Plaintiffs a great hardship and damages. Because of SocoPaint's breaches, Plaintiffs have not received the substantial benefit of SocoPaint's promised performance under the APA and TMA.

75.     As a direct and proximate result of SocoPaint's breaches of its obligations under the APA and TMA, Plaintiffs have suffered direct and consequential damages, in an amount in excess of $75,000, in addition to attorney's fees incurred in connection with collecting past due amounts under the agreements, royalty payments owed under the APA, and lost royalty payments that could have been paid had SocoPaint sufficiently qualified and marketed and sold the Purchased Products to customers. Further, because SocoPaint failed to provide sales records and information upon request as required by APA, Plaintiffs were unable to challenge SocoPaint's royalty payments.

76.     Plaintiffs' damages are increasing each day SocoPaint's breaches remain uncured and the revenue from the Purchased Products continues to be artificially and improperly depressed, along with interest and all costs and attorney's fees associated with this action.

77.     Plaintiffs are also entitled to reasonable attorney's fees and expenses under § 11.2 of the APA, which provides that SocoPaint shall indemnify, defend, and hold Products/Techniques harmless from and against Losses, including fees and expenses, arising out of or relating to "any breach or nonfulfillment of any covenant or agreement on the part of [SocoPaint] . . .," as well as under Tex. Civ. Prac. & Rem. Code § 38.001 *et seq.*

78.     Plaintiffs respectfully requests that the Court enter Judgment in their favor against SocoPaint and award damages to Plaintiffs, in an amount to be proven at trial, resulting from SocoPaint's breach of the APA and TMA, plus interest, costs, attorney's fees, and for such other further relief as the Court deems necessary and appropriate.

## COUNT II – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

79.     Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

80.     SocoPaint had a duty to Plaintiffs to act in good faith and to provide fair dealing under the APA.

81.     SocoPaint breached its duty of good faith and fair dealing by taking the following actions:

      a.      Failing to pay royalties;

      b.      Upon information and belief, failing to pay the proper amount of royalties based upon quarterly Net Sales within the United States;

      c.      Upon information and belief, failing to pay the proper amount of royalties based upon quarterly Net Sales outside of the United States;

      d.      Refusing to sell the Purchased Products to potential customers who expressed interest in purchasing the Purchased Products; and

e.     Failing to use reasonable efforts to qualify, market and promote the Purchased Products.

82.    These actions were taken in bad faith and improperly denied Plaintiffs the expected benefits flowing from the APA.

83.    As a direct and proximate result of SocoPaint's breaches of the duty of good faith and fair dealing implied in the APA, Plaintiffs have suffered direct and consequential damages, including, but not limited to attorney's fees incurred in connection with collecting past due amounts under the agreements, royalty payments owed under the APA, lost royalty payments that could have been paid had SocoPaint sufficiently qualified, marketed, and sold the Purchased Products to customers, and interest on the late and missing royalty payments.

84.    Plaintiffs respectfully requests that the Court enter Judgment in their favor against SocoPaint and award damages to Plaintiffs, in an amount to be proven at trial, resulting from SocoPaint's breach of the duty of good faith and fair dealing implied in the APA, plus interest, costs, attorney's fees, and for such other further relief as the Court deems necessary and appropriate.

## COUNT III – DECLARATORY JUDGMENT (28 U.S.C. §§ 2201-2202)

85.    Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

86.    A real, immediate, and justiciable controversy exists between Plaintiffs and SocoPaint regarding the parties' rights and obligations under the APA and TMA.

87.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, the Court has the power to determine questions regarding the construction and interpretation of contracts, and is further vested with the power to declare the rights, liabilities, and obligations and

other legal relations among parties to such contracts. In order to resolve any uncertainty relating to the rights, duties, and obligations of Plaintiffs and SocoPaint, it is necessary for the Court to interpret the APA and TMA, respectively, and determine whether SocoPaint is in material breach of its terms.

88.     There is a clear dispute regarding what constitutes SocoPaint's "good faith" and "commercially reasonable" operations of the Business. Plaintiffs seek declarations that under the APA SocoPaint was and is obligated to, at a minimum, do the following:

a.      SocoPaint must promptly undertake all reasonable steps to maintain the Business during the term of the APA.

b.      SocoPaint must have a dedicated sale person trained in and with knowledge of the Purchased Products.

c.      SocoPaint must undertake all necessary steps to qualify alternative manufacturing facilities for all Qualified Products by December 2022 to ensure no interruption in the manufacture and sale of Qualified Products once Products/Techniques ceased its toll-manufacturing operations.

d.      SocoPaint must undertake all necessary steps for Qualified Products produced at the alternative manufacturing facilities to be qualified by NAVAIR and added to, and subsequently retained in, the QPD.

e.      SocoPaint must maintain a sufficient inventory of the Purchased Products to match customer demand once Products/Techniques ceased its toll-manufacturing operations.

f.      SocoPaint must develop and maintain a supply chain for all raw materials and other components needed to manufacture the Purchased Products.

g.      SocoPaint is not permitted to discontinue sales and manufacturing of any of the Qualified Products.

h.      SocoPaint must maintain adequate quality control measures at its manufacturing facilities to ensure products delivered to customers meet applicable specifications.

i.       SocoPaint must promptly respond to customer inquiries concerning potential orders and/or complaints about the Purchased Products.

j.       SocoPaint must develop and regularly update a written marketing plan and marketing budget for the Purchased Products that sets forth a marketing strategy to not only maintain but also grow the customer base for the Purchased Products, which plan should include recent sales trends, target customers and potential customers and how best to reach them, product packaging, product pricing, a list of specific action items to advertise and market the Purchased Products, review of market competitors and market conditions (including supply chain issues, cost of raw materials, competitors' product offerings and pricing, and any changes to applicable regulations and specifications) to ensure the Purchased Products compete in price and performance, objective measures for evaluating past and contemplated marketing efforts, etc.

k.      SocoPaint must monitor laws, regulations, specifications, and industry announcements applicable to the Purchased Products and develop Derivatives of the Purchased Products as necessary to meet any modifications to specifications and stated purchasing preferences (*e.g.*, preference for environmentally friendly products) of the U.S. and global defense industries.

l.       SocoPaint must establish a joint steering committee that meets not less than once per year and more frequently as necessary to ensure the Qualified Products manufactured at alternative manufacturing facilities are added to, and retained in, the QPD, the written marketing

plan is sufficiently developed, updated, and implemented, and that research and development of Derivatives is occurring as needed.

m.     Plaintiffs reserve the right to seek additional declaratory judgment relief following discovery in this matter.

89.     Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs respectfully request that the Court enter Judgment in their favor and against SocoPaint, declare the SocoPaint is in material breach of the APA and TMA, make further judicial determinations of the respective rights and obligations of the parties is necessary and appropriate under the circumstances and as requested herein, in addition to such further relief the Court deems appropriate.

90.     Plaintiffs are also entitled to reasonable attorney's fees and expenses.

## <u>COUNT IV – UNJUST ENRICHMENT</u>

91.     Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

92.     SocoPaint's actions have resulted in its wrongful and unjust enrichment.

93.     SocoPaint obtained exclusive rights to the Purchased Products with the promise that it would use commercially reasonable and good faith efforts to manufacture, market, and sell them, and to pay Plaintiffs royalties on ensuing sales.

94.     SocoPaint retains the exclusive rights to the valuable Purchased Products but has not provided Plaintiffs with the fair and equitable purchase price, including both the monetary and nonmonetary components thereof, to which Plaintiffs were and are entitled.

95.     SocoPaint's actions and retention of the rights to the Purchased Products caused Plaintiffs damage.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, AND TEXAS UNIFORM TRADE SECRETS ACT, TEX. CIV. PRAC. & REM. CODE § 134A.

96.    Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

97.    The Defend Trade Secrets Act ("DTSA") forbids the actual misappropriation of trade secrets used in interstate commerce. 18 U.S.C. § 1836.

98.    Certain confidential and proprietary information of Plaintiffs constitutes trade secrets related to products used in interstate commerce, including product formulas and customers lists for the Excluded Products.

99.    Plaintiffs derive economic benefit from the fact that its trade secrets are not generally known to individuals or entities other than Plaintiffs. Plaintiffs have taken reasonable measures to protect and maintain their secrecy.

100.    Shortly after executing the APA, which explicitly excluded certain of Products/Techniques' products from the purchase and sale agreement, SocoPaint was granted limited access to Plaintiffs' ERP program for the sole purpose of designing a data interchange connection through which purchase order could be electronically pushed from SocoPaint's system to Plaintiffs' system. Under these circumstances, SocoPaint was well aware it was not permitted to access the product formulas and related proprietary and confidential information when it was permitted access to the server.

101.    Nevertheless, SocoPaint willfully and maliciously misappropriated Plaintiffs' trade secrets by obtaining and taking them for their own use and benefit.

102.    As a result of SocoPaint's misappropriation of Plaintiffs' trade secrets, Plaintiffs are entitled to recover their actual damages suffered as a result therefrom, including lost profits,

development costs SocoPaint avoided by the misappropriation, or the profits SocoPaint has earned from the misappropriation.

103.    Plaintiffs are also entitled to an award of exemplary damages under Tex. Civ. Prac. & Rem. Code § 134A.004.

104.    Plaintiffs are also entitled to recover their reasonable and necessary attorney's fees since SocoPaint's misappropriation of Plaintiffs' trade secrets was willful and malicious. Tex. Civ. PRac. & Rem. Code § 134A.005.

### COUNT VI – VIOLATION OF COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)

105.    Plaintiffs repeat, reallege, and incorporate herein by reference the allegations in the foregoing paragraphs, as though fully set forth herein.

106.    Plaintiffs' server is used in interstate commerce and is therefore a protected computer.

107.    SocoPaint intentionally exceeded its authority to access Plaintiffs' server and ERP software by downloading or otherwise obtaining product data which it had no right or authority to access or download and by transferring data to Plaintiffs' ERP system without authority or permission. SocoPaint also installed its own router in Plaintiffs' facility and connected it to Plaintiffs' server, also without authority or permission.

108.    SocoPaint obtained valuable information, including Plaintiff's product formulas, intellectual property, trade secrets, and proprietary information, through its unauthorized access.

109.    SocoPaint's unlawful access of Plaintiffs' ERP software corrupted the data therein, some of which could not be fully restored. In addition, SocoPaint's unauthorized installation and connection of its router to Plaintiffs' server crashed Plaintiffs' internet and phone services for four days, caused other intermittent interruptions in those networks during business hours, and

ultimately caused damage to Plaintiffs' networking and VOIP hardware, requiring such VOIP network and hardware to be replaced. Such damages and losses incurred by Plaintiffs as a result exceed $5,000.

110.    Plaintiffs are entitled to recover economic damages resulting from SocoPaint's unauthorized computer access.

## **PRAYER FOR RELIEF**

111.    WHEREFORE, Plaintiffs respectfully request that the Court grant it the following relief:

a.   Award declaratory judgment relief in the manner requested above;

b.   Enter Judgment against Defendant on each count of this Complaint respectively asserted against it;

c.   Award Plaintiffs actual, consequential, and exemplary damages;

d.   Award Plaintiffs attorney's fees, expenses, and costs for prosecuting this action through trial and any appeal;

e.   Award Plaintiffs pre- and post-judgment interest at the highest rate allowable by law; and

f.   Grant Plaintiffs all such further and additional relief, general and specific, at law or in equity, to which they are entitled.

Dated: October 4, 2023                    SMITH, KATZENSTEIN & JENKINS LLP

                                          */s/ Kelly A. Green*
                                          Kelly A. Green (No. 4095)
                                          1000 West Street, Suite 1501
                                          P.O. Box 410
                                          Wilmington, DE 19899 (courier 19801)
                                          (302) 652-8400
                                          kag@skjlaw.com

                                          Amanda L. Cottrell (Texas Bar No. 24064972)
                                          (*PHV to be Filed*)
                                          Steven G. Gersten (Texas Bar No. 24087579)
                                          (*PHV to be Filed*)
                                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                                          2200 Ross Avenue, 20th Floor
                                          Dallas, Texas 75201
                                          Tel. (469) 391-7432
                                          Fax (469) 391-7401
                                          acottrell@sheppardmullin.com
                                          sgersten@sheppardmullin.com

                                          ***Attorneys for Plaintiffs Products/Techniques, Inc.
                                          and Steven Andrews***